UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| JASON MCFALL HUDSON-MILTENBERGER, | ) | Case No. 14-45118-659 |
| | ) | Judge Kathy A. Surratt-States |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| PHILLIPS 66 COMPANY, | ) | **Adversary No. 14-4262-659** |
| | ) | |
| | ) | |
| Plaintiff, | ) | **PUBLISHED** |
| | ) | |
| -v- | ) | |
| | ) | |
| JASON MILTENBERGER, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The matter before the Court is Plaintiff's Second Amended Complaint, Answer to Second Amended Complaint of Plaintiff Phillips 66 Company, Defendant's Trial Brief, Phillips 66 Company's Trial Brief, Joint Statement of Stipulated Facts, and Phillips 66 Company's Post-Trial Brief on Assignment of Guaranty. A trial was held on October 18, 2016, at which Plaintiff appeared by counsel and Debtor appeared in person and by counsel. The parties presented oral argument and witnesses provided testimony. The matter was taken under submission. Upon consideration of the record as a whole, the Court issues the following **FINDINGS OF FACT**:

The parties in this case have stipulated to the following uncontested facts. Steven A. Miltenberger (hereinafter "Steven") was the President and Corporate Secretary of Jump Oil., Inc. (hereinafter "Jump Oil"), a marketer of gasoline and petroleum-based distillate products from its inception in 2003 through December 31, 2013. Joint Statement of Stipulated Facts, ¶ 1. Prior to a name change to Jump Oil in 2003, Jump Oil was known as Northstar Dynamics. Joint Statement of Stipulated Facts, ¶ 2. In or about 2004, ConocoPhillips Company (hereinafter "ConocoPhillips")

and Miltenberger Oil Co. Inc. (hereinafter "Miltenberger Oil") executed a Branded Marketer Agreement (hereinafter "2004 BMA").  Joint Statement of Stipulated Facts, ¶ 3.  Steven signed the 2004 BMA on behalf of Miltenberger Oil as its President.  Joint Statement of Stipulated Facts, ¶ 4.  In July 2004, the 2004 BMA was assigned to Jump Oil., Inc. (hereinafter "Jump Oil").  Joint Statement of Stipulated Facts, ¶ 5.  Steven signed the 2004 Assignment on behalf of Jump Oil.  Joint Statement of Stipulated Facts, ¶ 6.  Jump Oil executed Brand Marketer Agreements in 2007 and 2010 (hereinafter "2007 BMA" and "2010 BMA", respectively).  Joint Statement of Stipulated Facts, ¶ 7.  Steven signed the 2007 and 2010 BMAs on behalf of Jump Oil. Joint Statement of Stipulated Facts, ¶ 8.  In 2009, Jump Oil executed a Brand Incentive Program Agreement (hereinafter "BIP") with ConocoPhillips.  Joint Statement of Stipulated Facts, ¶ 9.  Under the BIP, among other things, ConocoPhillips provided monetary incentive payments to Jump Oil.  Joint Statement of Stipulated Facts, ¶ 10.  Under the BIP, among other things, Jump Oil agreed to remain current on ConocoPhillips brand and image standards and to purchase a minimum volume of gasoline and distillates from ConocoPhillips.  Joint Statement of Stipulated Facts, ¶ 11.  The BIP provided that in the event the 2010 BMA is terminated, Jump Oil would be responsible for repaying a certain percentage of the incentive payments based on the number of years Jump Oil has been enrolled in the program.  Joint Statement of Stipulated Facts, ¶ 12.  The BIP also provided that Jump Oil would be responsible for repaying certain incentive payments in the event it failed to purchase the required minimum amount of gasoline and distillates from ConocoPhillips.  Joint Statement of Stipulated Facts, ¶ 13.

In 2004, the owners of Jump Oil were Debtor, Jason M. Miltenberger (hereinafter "Debtor"), Steven, David A. Miltenberger (hereinafter "David"), Melissa Moore Miltenberger (hereinafter "Melissa"), and Sondra Miltenberger (hereinafter "Sondra").  Joint Statement of Stipulated Facts, ¶ 14.  In 2004, Steven, Sondra and David executed a guaranty agreement that guaranteed Jump Oil's then existing and future indebtedness to ConocoPhillips, successor in

interest to Phillips 66.  Joint Statement of Stipulated Facts, ¶ 15.  In 2004, Debtor executed a guaranty agreement (hereinafter "Guaranty") that guaranteed Jump Oil's then existing and future indebtedness to ConocoPhillips, successor in interest to Phillips 66.  Joint Statement of Stipulated Facts, ¶ 16.  The Guaranty signed by Debtor, and purportedly signed by Melissa, was notarized by Steven's secretary, Becky Bledsoe (hereinafter "Becky"), on March 24, 2004.  Joint Statement of Stipulated Facts, ¶ 17.  Subsequent information verified that Melissa did not sign the Guaranty with Debtor. The signature that appears on the Guaranty is not Melissa's signature.  Joint Statement of Stipulated Facts, ¶ 18.

Debtor's Guaranty, as well as the other guaranties, contain language indicating that they were continuing guaranties applicable to Jump Oil's future agreements, leases and other obligations unless and until the guarantor or his or her legal representative gave notice in writing not to enter into further agreements, leases, or other obligations, nor to extend credit on the security of the guaranty.  Joint Statement of Stipulated Facts, ¶ 19.  Neither Debtor nor his legal representative gave notice in writing to ConocoPhillips under Debtor's Guaranty not to enter into further agreements, leases or other obligations, nor to extend further credit on the security of the Guaranty.  Joint Statement of Stipulated Facts, ¶ 20.

The terms of the Guaranty, as well as the other guaranties, state: "[Guarantor] hereby guarantees unconditionally the full and prompt payment of all present and future indebtedness of Jump Oil . . . to ConocoPhillips Company . . . ."  Joint Statement of Stipulated Facts, ¶ 21.  The terms of the Guaranty, as well as the other guaranties, state: "Guarantor's obligation under this guaranty is a guaranty of payment and not of collection.  Should any present or future indebtedness incurred by [Jump Oil] not be paid when due, ConocoPhillips may proceed against guarantor for such indebtedness at any time . . . ."
Joint Statement of Stipulated Facts, ¶ 22.  The terms of the Guaranty, as well as the other guaranties state: "THIS IS TO BE A CONTINUING GUARANTY, and any such extension or

acceptance of any sum or sums on account, or of any note or draft of [Jump Oil] . . .or security [] from [Jump Oil] shall not effect this Guaranty." Joint Statement of Stipulated Facts, ¶ 23. The terms of the Guaranty as well as the other guaranties, state: "This Guaranty shall continue until Guarantor . . . shall have given written notice . . . to ConocoPhillips . . . to make no further advances on the security hereof." Joint Statement of Stipulated Facts, ¶ 24. The Guaranty, as well as the other guaranties, contain language indicating that they apply to "CONOCOPHILLIPS COMPANY, ITS SUCCESSORS AND ASSIGNS, AND ANY OF ITS SUBSIDIARIES OR AFFILIATES." Joint Statement of Stipulated Facts, ¶ 25. The Guaranty, as well as the other guaranties, contain language indicating that they "shall inure to and be binding on the parties, their representatives, successors and assigns." Joint Statement of Stipulated Facts, ¶ 26. The Guaranty, as well as the other guaranties, provide they are to be interpreted under Texas law. Joint Statement of Stipulated Facts, ¶ 27.

Under the 2004, 2007, and 2010 BMAs, ConocoPhillips agreed, among other things, to allow Jump Oil to use licensed ConocoPhillips brands and to supply Jump Oil with marketing materials and motor fuels. Joint Statement of Stipulated Facts, ¶ 28. Under the 2004, 2007, 2010 BMAs, Jump Oil agreed, among other things, to purchase a minimum amount of motor fuels, to participate in ConocoPhillips marketing programs and to follow ConocoPhillips guidelines regarding image standards, product identification, price and payment terms, credit cards, and network access. Joint Statement of Stipulated Facts, ¶ 29.

Jump Oil failed to pay all amounts due under the 2010 BMA and the BIP, breaching those agreements. Joint Statement of Stipulated Facts, ¶ 30. On or about December 15, 2011, ConocoPhillips sent a written demand to Jump Oil which demanded that Jump Oil pay all amounts due, which at that time totaled $5,887,130.99, exclusive of any applicable interest and attorney's fees under the 2010 BMA and the BIP. Joint Statement of Stipulated Facts, ¶ 31. Jump Oil continues to be in default under the 2010 BMA and the BIP, and filed Chapter 11 bankruptcy on

February 13, 2013.  Joint Statement of Stipulated Facts, ¶ 32. On or about December 15, 2011, ConocoPhillips sent a written demand to Debtor requesting that he pay all amounts Jump Oil owed to ConocoPhillips.  Joint Statement of Stipulated Facts, ¶ 33.  To date Debtor has not paid any amounts that Jump Oil owes to Phillips 66 under his Guaranty.  Joint Statement of Stipulated Facts, ¶ 34.  To date, neither Steven, Sondra, nor David have paid any amounts that Jump Oil owes to Phillips 66 under their respective guaranty agreements.  Joint Statement of Stipulated Facts, ¶ 35.

Debtor filed his Voluntary Petition for relief under Chapter 7 of the Bankruptcy Code on June 25, 2014.  Joint Statement of Stipulated Facts, ¶ 36.  On September 19, 2014, Phillips 66 Company filed this Adversary Proceeding objecting to dischargeability under section 523(a)(2)(A) of the Bankruptcy Code.  Plaintiff argues that the debt owed by Debtor should be excepted from discharge because the debt was obtained fraudulently.  Debtor denies Plaintiff's allegations and argues that the debt should be discharageable.

Plaintiff contends that Debtor knew, at Steven's direction that Becky would notarize documents without the signatory being present.  Plaintiff argues that with the forged signature on the Guaranty, Debtor remained silent and knowingly presented or participated in the decision to present the Guaranty to Plaintiff.  Plaintiff argues that Debtor demonstrated a reckless disregard for the truth or falsity of the representation made by forging Melissa's signature and remaining silent as to the forgery.  Plaintiff relies on Melissa's testimony at trial to substantiate its position.  Here, Melissa testified that she and Jason separated in 2008 and finalized their divorce in 2010.  Melissa testified that there were several problems that led to their marriage dissolving including infidelity, drug use and financial problems.  These problems, according to Melissa, started in 2004 and grew worse up until the divorce.  Melissa testified that she did not sign the Guaranty.  *See* Plaintiff's Exhibit 9. Melissa further testified that she did not give anyone permission to sign the Guaranty on her behalf and would not have signed the Guaranty if Debtor had presented it to her.

Debtor argues that he did not know the representation was false at the time it was made.

-5-

At trial Debtor, testified that his role in Jump Oil was to manage the field operations which in turn kept him out of the office and visiting the company's retail store locations. Debtor testified that he did not have an office set up in Bolliver, Missouri where Steven and Becky managed the day-to-day operations. In regards to the Guaranty at issue, Debtor testified that Becky presented him with the document while he visited Jump Oil's Bolliver, Missouri office. Debtor testified that he signed the Guaranty and returned it to Becky. Debtor further testified that when he signed the Guaranty he did not see any other signatures on it and he did not sign Melissa's signature. Becky's deposition testimony demonstrated that Becky conducted her job as notary as directed by Steven, meaning that there was a chance that she could have notarized the signature of a person who was not present as long as it was authorized by her boss, Steven.

Plaintiff argues that Debtor made a representation when he allegedly forged Melissa's signature on the Guaranty and then requested Becky to notarize the forged signature even though Melissa was not physically present at the time. Debtor contends that there is no evidence proving Debtor forged Melissa's signature, sent the Guaranty to Plaintiff or asked that it be sent. At trial, Debtor testified that it was routine business practices at Jump Oil for Becky to solicit signatures for documents that needed to be signed for the company. Debtor testified that Becky would hand him a document, request his signature, and take the document back. Debtor testified that he recalls signing the Guaranty and returning it right back to Becky. Debtor testified that he did not see any other signatures on the Guaranty at the time he signed it and did not participate in the delivery of the Guaranty to Plaintiff.

Plaintiff argues that Debtor knew Plaintiff required guaranties from all owners of Jump Oil as a condition to extending Jump Oil credit, including obtaining Melissa's signature. Debtor contends that he did not trick ConocoPhillips into making the deal and that there is no evidence that he made the alleged representation with the intent to deceive ConocoPhillips. At trial, Debtor testified that he, unlike Steven, worked in the field, visiting stores on behalf of Jump Oil. Debtor

testified that though he was an owner of Jump Oil, it was his brother Steven who controlled the day-to-day operations such as contracts and relationships with companies like ConocoPhillips. Debtor described his role in the company as being in charge of the retail side of the business from about 2003 to 2009 and then he worked on wholesale fuels during the remaining time at Jump Oil.

Plaintiff argues that it relied on the written signatures from all the owners of Jump Oil because it was a closely held, family-owned corporation. Plaintiff contends that it had no reason to believe that Melissa's signature was forged and therefore, did not investigate the accuracy of the representation. Debtor argues that the Guaranty was signed in 2004 but the primary obligation at issue is based on the 2010 BMA and the BIP which was entered into after Debtor and Melissa were divorced. Debtor also argues that the assignment of the Guaranty from ConocoPhillips to Phillips 66 without Debtor's consent is a material alteration that results of the underlying debt being discharged as to Debtor.

## JURISDICTION

The Court has jurisdiction over the parties and subject matter of this proceeding under 28 U.S.C. §§ 151, 157, and 1334 (2014) and Local Rule 81-9.01(B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (I) (2014). Venue is proper in this District under 28 § 1409(a) (2014).

## CONCLUSIONS OF LAW

The Court will first address Debtor's argument that the assignment of the Guaranty from ConocoPhillips to Phillips 66 without Debtor's consent is a material alteration that results in the underlying debt being discharged as to the guarantor, here Debtor. Debtor argues that the material alteration in the principal obligation voids the personal guaranty. Debtor alleges that the material alteration is the assignment of the Guaranty without his consent. Debtor cites several cases from Missouri in support of his argument; however, as the parties both acknowledge, the issue of the discharge of a guaranty is to be determined by Texas state law. See Defendant's Trial Brief, pg.

11. The only Texas case cited is *McLane Foodservice, Inc. v. Table Rock Restaurants, LLC.*, 736 F. 3d 375 (5th Cir. 2013), which Debtor uses to support his argument that an assignment is a material alteration that results in a discharge. Plaintiff argues that this case is not on point because it does not address that particular issue. The Court finds that this case is not on point with the issue because the Fifth Circuit discharged the obligation due to an unmet requirement within the assignment, not because the assignment rose to the level of a material alteration rendering a discharge.

Under Texas law, the requirement for a guarantor to discharge his obligations is much more than simply a non-consenting assignment. For a guarantor to be discharged from liability, he must prove (1) a material alteration of the underlying contract, (2) made without the guarantor's consent, and (3) which is to the guarantor's detriment. *Futerfas Family Partners v. Griffin*, 374 S.W. 473,478-79 (Tex. App. 2012). Debtor alleges that the material alteration is the assignment to Plaintiff without his consent; however, he does not state an explanation of why the assignment is a material alteration with corresponding case law. Further, Debtor fails to argue that the alleged material alteration is a detriment to his interest. Thus, Debtor has failed to allege that the assignment was a detriment. Therefore, this Court finds that since all three elements have not been met, Debtor's argument that the debt owed pursuant to the Guaranty is discharged fails.

Section 523(a)(2)(A), states in relevant part, that a debtor cannot obtain a discharge from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. Section 523(a)(2)(A) (2014). "Section 523(a)(2)(A) provides three distinct, but often intermingled, bas[e]s for nondischargeability: false pretenses, a false representation or actual fraud." *In re C.R. Fields, III*, 544 B.R. 156, 172 (Bankr. E.D. Ark. 2016) (citation omitted). Nonetheless, "[e]xceptions to discharge under § 523(a) are to be strictly and narrowly construed against the creditor and liberally

in favor of the debtor to facilitate the debtor's fresh start." *In re Sulier*, 541 B.R. 867, 877 (Bankr. D. Minn. 2015)(citing *In re Thompson*, 686 F.3d 940, 944 (8th Cir.2012) (citations omitted)).

To prevail under section 523(a)(2)(A), Plaintiff must prove the following elements by a preponderance of the evidence:

> 1. The debtor made a representation.
> 2. The debtor knew the representation was false at the time it was made.
> 3. The representation was deliberately made for the purpose of deceiving creditor.
> 4. The creditor justifiably relied on the representation.
> 5. The creditor sustained the alleged loss as the proximate result of the representation having been made.

*In re Days*, 540 B.R. 423, 428 (Bankr. E.D. Mo. 2015) (citing *In re Maurer*, 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000); *Grogan v. Garner*, 498 U.S. 279, 281, 111 S.Ct. 655, 112 L.Ed.2d 755 (1991)). The Court will address each element in turn.

First, Plaintiff must demonstrate that Debtor made a representation. "A direct misrepresentation includes oral or written assertions and 'any other conduct that amounts to an assertion not in accordance with the truth'." *In re Sulier*, 541 B.R. 867, 878 (Bankr. D. Minn. 2015)(quoting *In re Moen*, 238 B.R. 785, 791 (8th Cir. B.A.P. 1999)). There is not sufficient evidence demonstrating that Debtor made the false representation to Plaintiff, so the Court must look to Debtor's conduct. Although there is no doubt that Melissa's signature on the Guaranty was forged, it is unclear who forged the signature. Thus, in this case the Court has insufficient evidence to conclude that Debtor made the false representation failing to prove the first element under section 523(a)(2)(A).

Second, Plaintiff must prove Debtor knew the representation was false at the time it was made. "A representation that is made 'under circumstances where a debtor should have known of the falsity is one made with reckless disregard for the truth' satisfies the knowledge requirement." *In re Sulier*, 541 B.R. at 879. Further, "[i]n assessing the debtor's knowledge of the falsity of the representation . . . the Court must consider the knowledge or experience of the debtor." *In re Moen*,

238 B.R. 785, 791 (B.A.P. 8th Cir. 1999)(quoting *In re Duggan*, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994)).

The following portion of Becky's testimony causes this Court to question Plaintiff's position that Debtor would have had any authority to authorize Becky to notarize a signature that was not his own. The relevant portion of Becky's deposition testimony reads as follows:

> Q: Did he on– did he ever have an occasion to come by and ask you to notarize his signature on a document that was for someone else? In other words, it wasn't his signature, it was someone else's signature?
> A: I do not remember that he did that.
> Q: All right.
> A: But it is possible.
> Q: If he asked you to do that, did you have the same level of trust in him as you did in Steven Miltenberger, that he was giving you an accurate signature?
> A: I would have asked Steven–
> Q: And why is that?
> A: Because he was my boss. Jason was not my boss.

The Court finds that Becky's testimony casts doubt on Plaintiff's contention that Debtor would have been able to direct Becky to notarize a document in which there was a signatory that was not present. Even so, Becky would not have proceeded without Steven's authority. Becky's testimony neither confirms nor denies that Debtor would have known of the falsity of Melissa's signature on the Guaranty. Further, Becky does not recall notarizing the Guaranty with anyone else's signature. The Court finds that Becky's deposition testimony, along with Debtor's testimony at trial to be compelling. The Court cannot imply that Debtor had a reckless disregard for the truth by virtue of Debtor knowing that Melissa would not sign the Guaranty due to their marital problems. The marital problems raise a red flag, but the Court is not convinced that Debtor had the requisite knowledge of the forgery when the representation to ConocoPhillips was made. Thus, the Court finds that Plaintiff fails to prove that Debtor was aware of the falsity when the representation was made.

Third, Plaintiff must prove that Debtor made the representation with the intent to deceive Plaintiff. "The intent element of § 523(a)(2)(A) does not require a finding of malevolence or

-10-

personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question." *In re Swan*, 156 B.R. 618, 623 n. 6 (Bankr.D.Minn.1993) (citing *In re Hunter*, 771 F.2d 1126, 1129 (8th Cir.1985)). "Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *In re Van Horne*, 823 F.2d 1285, 1287(8th Cir.1987). Intent to deceive will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act. *Duggan*, 169 B.R. at 324. As the Court has mentioned above, it is apparent that Debtor signs documents as directed and did not engage in any further involvement that would give him the motivation to deceive Plaintiff. Debtor was an owner, but was not involved in the business aspect of Jump Oil like Steven who was the President of Jump Oil. Thus, the Court finds that Plaintiff has failed to prove Debtor intended to deceive Plaintiff.

The fourth element Plaintiff must prove is that it justifiably relied on the representation. "This is a lower standard than 'reasonable reliance' and involves no duty to investigate." *In re Davenport*, 491 B.R. 911, 918 (Bankr. W.D. Mo. 2013) (citing *Field v. Mans*, 516 U.S. 59, 74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). "It is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Id.* (citations omitted). The Court finds that Plaintiff justifiably relied on the representation of the Guaranty and had no duty to investigate the signatures. Therefore, Plaintiff proves element four.

The fifth and final element Plaintiff must prove is whether it sustained the alleged loss as the proximate result of the representation having been made. Plaintiff contends that Debtor owes $5,887,130.99 under the BMAs. The Court finds that the amount owed is a loss that Plaintiff sustained as a result of relying on the representation of the Guaranty. Thus, Plaintiff proves the

fifth element.

      Based on the foregoing, Plaintiff has not proven all the elements required for the debt to be excepted from discharge. Therefore, the debt owed to Plaintiff is not excepted from discharge under Section 523(a)(2)(A).

*Kathy A. Surratt-States*

KATHY A. SURRATT-STATES
Chief United States Bankruptcy Judge

DATED: January 26, 2018
St. Louis, Missouri

Copies to:

Office of the United States Trustee
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Suite 6.353
St. Louis, MO  63102

Darin Lee Brooks
Gray Reed & McGraw, P.C.
1300 Post Oak Blvd.
Suite 2000
Houston, TX 77056

Mark A. Ludolph
Heyl, Royster, Voelker & Allen
124 S. W. Adams St., Ste 600
Peoria, IL 61602

Leonard Komen
13321 N. Outer 40 Rd., Ste. 100
Town & Country, MO 63017

Phillips 66 Company
a div. of Phillips Petroleum Co.
P.O. Box 80
Bartlesville, OK 74005

John Gregory George, Jr.
Beirne Maynard & Parsons, L.L.P.
112 E. Pecan, Suite 2750
San Antonio, TX 78205

Jason Miltenberger
163 Southdown Drive
Chesterfield, MO 63017